```
                UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF WEST VIRGINIA
                         AT CHARLESTON
```

**UNITED STATES OF AMERICA**

v.                              CRIMINAL ACTION NO. 2:17-00080

**RICHARD THOMAS MORRIS, JR.**


<u>MEMORANDUM OPINION AND ORDER</u>

Upon the evidentiary hearing held on September 11 and 12, 2017, on the defendant's Motion to Suppress, the court makes the following findings of fact by a preponderance of the evidence, as well as the conclusions of law that follow.

I.  Findings of Fact

On November 17, 2016, and for years before as well as now, Russell Atkinson has held a Highway Route Contract ("HRC") with the United States Postal Service.  The defendant, Richard Thomas Morris, Jr., is his son-in-law who along with his family resides with him.  The defendant has served from time to time as the unpaid driver for the route assigned to Mr. Atkinson. Recently, he has been the regular driver six days each week.

The route includes the link from Ravenswood to Belleville, West Virginia, which was traversed by the defendant on a daily basis, leaving the Ravenswood post office at about 2:00 p.m. after picking up the mail there, and arriving at the post office in Belleville, approximately 14.7 miles away, as part of a tight schedule that assured timely pickup and delivery. In recent months prior to November 17, 2016, the post office received persistent customer complaints about delivery failures related to the 2:00 p.m. link from Ravenswood to Belleville.

Those complaints prompted the postal authorities to include, in the batch of mail picked up at the 2:00 p.m. departure from Ravenswood, eight "test pieces" of mail, one on each of eight occasions. The eight pieces consisted of rather obvious greeting cards mail containing an enclosure of monetary value. The eight test pieces that were placed in the batches of mail delivered by the defendant out of Ravenswood were not seen to have been tampered with but the eighth, on August 29, 2016, was not delivered to the addressee.

An ninth test piece was inserted by the postal authorities in the batch of mail that the defendant picked up in an orange tub at Ravenswood at about 2:00 p.m. on November 17,

2016.  It was placed on top where it would be immediately seen. It contained a credit card-sized beacon transmitter that emitted a steady beep once every four or five seconds, referred to as the confidential sound.  The beep could be detected by portable radio on a FM frequency.  If the envelope containing the test piece were opened or if the test piece were bent, the confidential sound of a beep every four or five seconds became an alert sound that emitted a beep once per second.

Four postal officers, in three cars, followed the defendant on that day to Belleville.  One car was driven by Inspector Melissa Maria Belmont.  Another was driven by Special Agent Todd Phillips.  The third was driven by Inspector Seth Summers, with Inspector Joshua Mehall as his passenger.

On the Route 68 trip to Belleville, the defendant drove on the two-lane open road at speeds in excess of 70 miles per hour despite the 55 mile per hour limit.  In view of the winding and curving nature of much of that stretch of highway, the postal officers' vehicles were unable to keep up with the defendant.  As a consequence, the defendant got out of range of the confidential sound initially received by the pursuing officers.  It did not matter that the confidential sound was temporarily lost or that the defendant's vehicle got out of sight.  The postal officers knew

that defendant was bound for the Belleville post office and that they would find him there with or without the benefit of the beacon transmitter.  Consequently, they were, in effect, able to maintain visual surveillance throughout without the aid of the transmitter.

About half way along the way, the defendant pulled his vehicle over to the side of the road and, just as Inspector Belmont in the lead car passed him, he was seen walking quickly to the rear of the truck.  By the time Agent Phillips reached the defendant's stopped vehicle, he observed the defendant in the back of the truck, with the back door open, bending over the mail in the orange tub.  As Agent Phillips passed the stopped vehicle, his radio picked up the alert sound indicating that the test piece greeting card had been opened.  All three cars proceeded on to Belleville, but before arriving at the Belleville post office they allowed the defendant to reach that point first.  Agent Phillips did so by stopping at a parking lot near the post office where his radio still received the alert tone.

The defendant backed his truck into the loading dock at the rear of the post office.  At that point, Inspector Summers, followed immediately by Agent Phillips, arrived and parked their vehicles to the right of the post office.  Inspector Summers parked on the gravel driveway access leading to the rear of the post office with his vehicle located closest to the post office, with

4

half of it on the grassy edge and half on the gravel area. Agent Phillips parked on the opposite side of the gravel driveway, on the grassy area to the right, and adjacent to the driveway. When Inspector Belmont arrived about three minutes later at approximately 2:36 p.m., she parked in line with the Summers vehicle.[1]

When Inspector Summers arrived, he received the alert sound on his portable radio. He immediately engaged the defendant, who was standing by the driver's side of the truck. He informed the defendant that the officers were investigating complaints of stolen mail, and advised the defendant that he wished to talk to him. The defendant, who had left the engine running in his truck, was at the same time advised that he was free to leave and was not under arrest. After Inspector Summers had some conversation with the defendant, Inspector Belmont arrived just as Inspector Summers was asking the defendant for consent to search the rear of the truck. The defendant gave his consent, as heard both by Summers and Mehall. Inspector Summers informed Inspector Belmont that he had received defendant's consent to search the back of the truck. He did so in the presence of the defendant and Inspector Mehall at which time he also informed Inspector Belmont that he had let the

---

[1] A fifth officer, Inspector DiDomenico, arrived at Belleville perhaps 45 minutes after the other officers and did not play a significant role in the events at issue.

5

defendant know that he was not under arrest and that he was free to leave.  Inspector Summers then went into the rear of the truck and within a minute or two found the opened test piece of mail that had been emitting the alert sound.

After examining the mail for a few minutes, Inspector Summers asked the defendant for his consent to search the cab, which consent the defendant also gave.  Upon examining the cab, Inspector Summers found attached to the visor a second opened piece of mail that consisted of a greeting card from Mark Price to Jacob Cox.  The greeting card had been deposited at the Ravenswood post office at about 1:30 p.m. that day.

While the search was taking place, Inspector Belmont interviewed the defendant who at the outset admitted to nothing.  The defendant initially denied opening the test piece.  As the interview progressed, he gradually came to admit a limited role in the thefts, vacillating from time to time.  The interview of the defendant would have commenced at about 2:45 p.m. and continued for about 50 minutes until the defendant asked to be permitted to write out a statement, which he was allowed to do.  For this purpose, he went to the cab of his truck at 3:41 p.m. and returned at 3:53 p.m. with the handwritten statement that has been admitted into evidence.  In that statement, he admitted that he did "knowingly take stuff that did not belong" to him and added, "I took gift card

and got money out of them to pay bills . . ." He expressed sorrow for what he had done and concluded by saying, "I told the truth to Investigators to the best of my nollage [sic]."

During the time that the postal officers were with the defendant, he was told by Inspector Summers at the very outset that he was not under arrest and that he was free to leave. When Inspector Belmont arrived a few minutes later, Inspector Summers stated to Inspector Belmont, in the presence of the defendant, that he had informed the defendant that he was not under arrest and free to leave. Thereafter, during the interview by Inspector Belmont of the defendant, she twice told him the same thing.

Throughout the encounter at Belleville, the officers dealt with the defendant calmly and allowed him to talk to his wife on his phone, send text messages and smoke a cigarette. When they asked the defendant to allow them to look at his phone, he declined this request and it was not further pursued. Each of the postal officers was armed with a firearm, as is commonly known by those whose work involves them. The firearm carried by Summers and the one carried by Mehall were visible. They were not brandished. The firearm carried by Phillips and the one carried by Belmont were not visible. Although the position of the officers' cars would have blocked the defendant's truck from exiting over the gravel pathway during the first 20 minutes of the encounter, at which point they

7

were moved, there was a near 20-foot wide grassy area to the right of the Phillips vehicle over which the defendant could have exited.

At no time at Belleville did the postal officers threaten the defendant with the loss of the Atkinson HRC or even mention it. The defendant, of course, was neither the holder of the Atkinson contract nor an employee of the postal service or the government. Rather, he was simply a volunteer driver.

## II. Conclusions of Law

Throughout the encounter at the Belleville post office, the defendant was informed that he was not under arrest and was free to leave at any time. Indeed, he was told that repeatedly. Had the defendant chosen to do so, he could have driven his truck away from that scene at any time, although the officers would have doubtlessly first taken a moment to remove the orange tub containing the mail from the back of the truck. There was a way out. From the beginning, he could have exited in the wide grassy area to the right of the post office driveway. After the lapse of the first twenty minutes at the scene, he could have departed down the grass and gravel driveway through which he entered inasmuch as Inspector Summers had moved all the cars that were parked in the entryway. Under the totality of the circumstances, it is apparent that the defendant was not under arrest, was not in custody and was

free and able to leave at any time.  Consequently, <u>Miranda</u> warnings were unnecessary.

Inasmuch as the defendant was not threatened with the loss by his father-in-law, Mr. Atkinson, of the HRC contract, and inasmuch further as that possible prospect was not mentioned by any of the postal officers present at Belleville, there is no requirement that the defendant have been advised of any rights under <u>Garrity v. New Jersey</u>, 385 U.S. 493 (1967).  Moreover, the defendant himself was not an employee of, nor a contractor with, the United States Postal Service or the United States government.  <u>Garrity</u> is thus inapplicable.

The defendant knowingly and voluntarily gave his consent that the back of the truck containing the mail could be searched by the postal officers at Belleville and knowingly and voluntarily consented as well that the cab of his truck could be searched.  By virtue of the officers having made the searches with the knowing and voluntary consent of the defendant, there is no Fourth Amendment violation.

For the foregoing reasons, the motion to suppress is denied.

The Clerk is directed to forward copies of this order to the defendant, all counsel of record, the United States Probation Department, and the United States Marshal.

DATED: October 11, 2017

John T. Copenhaver, Jr.
United States District Judge